**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 10, 2017**

# In the Court of Appeals of Georgia

A17A0243. CENTRAL GEORGIA WOMEN'S HEALTH CENTER, LLC et al. v. DEAN et al.

BARNES, Presiding Judge.

Katherine B. Dean and Lester Harold Dean, IV, individually and as administrators of the estate of their deceased child, filed this medical malpractice action against several defendants, including Dr. Henry J. Davis and Central Georgia Women's Health Center, LLC (collectively, the "Davis Defendants"), seeking damages for the wrongful death of their child and for the pain and suffering of their child and Mrs. Dean. Following a seven-day trial, the jury awarded the plaintiffs over $4 million in damages and apportioned 50 percent of the fault to the Davis Defendants.[1] The Davis Defendants now appeal, contending that the trial court erred in denying their motions for directed verdict and for judgment notwithstanding the verdict ("j. n. o. v.") because

---

[1] The jury apportioned the remaining 50 percent of the fault to a different defendant physician, who is not a party to this appeal.

the plaintiffs failed to present evidence to a reasonable degree of medical certainty that the child's premature delivery and death could have been prevented by Dr. Davis. The Davis Defendants also contend that the trial court erred in denying their motion for new trial because the plaintiffs should not have been permitted to cross-examine Dr. Davis about an entry he made in Mrs. Dean's hospital chart that the plaintiffs alleged was probative of his untruthfulness. For the reasons discussed below, we affirm.

Construed in favor of the jury's verdict,[2] the evidence shows that in April 2007, Mrs. Dean became a patient at the Central Georgia Women's Health Center, LLC ("Women's Health Center"), an obstetrics-gynecology practice in Macon. Mrs. Dean was 33 years old and 6 weeks pregnant at her first visit. She had two prior miscarriages and had previously undergone a loop electrosurgical excision procedure ("LEEP") to remove abnormal tissue from her cervix. Undergoing a LEEP procedure can place a woman at risk for a medical condition known as an "incompetent" or "insufficient" cervix in which the cervix is too weak, without medical intervention, to support a pregnancy to term. Administering progesterone and/or performing a "cerclage," a

---

[2] See *Park v. Nichols*, 307 Ga. App. 841, 845 (2) (706 SE2d 698) (2011).

surgical procedure in which the cervix is sewn closed during pregnancy, were known treatments for cervical incompetence in 2007.

On her initial office visit at the Women's Health Center, Mrs. Dean saw Dr. Kerry Holliman and informed her of her medical history. Because of Mrs. Dean's prior LEEP procedure, Dr. Holliman ordered that ultrasounds be performed at an increased frequency throughout the pregnancy. The ultrasounds would show whether Mrs. Dean's cervix abnormally shortened in length and/or exhibited funneling,[3] which are prominent markers for cervical incompetence and preterm delivery.

*The July 25, 2007 Ultrasound.* Over the course of her pregnancy, Mrs. Dean's ultrasounds showed a progressive shortening of her cervix. At Mrs. Dean's first ultrasound visit on April 2, 2007, her cervical length was 4.4 centimeters. By July 11, 2007, her cervical length was 3.6 centimeters. A subsequent ultrasound on July 25, 2007 showed that Mrs. Dean's cervix had shortened to 1.9 centimeters with funneling at one point during the ultrasound.

Mrs. Dean was 22 weeks, 4 days pregnant at the time of the July 25 ultrasound. A cervical length of less than 2.5 centimeters at that early stage of a pregnancy is

---

[3] Funneling refers to dilation at the internal orifice of the uterus, with protrusion of the amniotic sac into the cervical canal.

considered "critical" and increases the risk of premature delivery (i.e., before 34 weeks) to greater than 50 percent. A baby born prematurely at 22 weeks has approximately a 10 percent chance of survival. Based on the July 25 ultrasound results, Dr. Holliman told Mrs. Dean to "take it easy," not lift any heavy objects, and come back to the office in one week for an additional ultrasound.

*The July 31, 2007 Hospital Visit and Call to Dr. Davis.* After the July 25 ultrasound, Mrs. Dean stayed home from work and rested. However, before the week passed, on the evening of July 31, 2007, Mrs. Dean began to have thick, dark vaginal discharge. Mrs. Dean and her husband drove to the hospital emergency room. On the way to the hospital, Mrs. Dean spoke on the telephone with Dr. Davis, who was the obstetrician-gynecologist on-call that night for the Women's Health Center. Mrs. Dean informed Dr. Davis of her prior LEEP procedure, the shortening of her cervix shown on the July 25 ultrasound, her week of bed rest, and the thick brown discharge. Dr. Davis told Mrs. Dean that the thick brown discharge was probably "old blood" from the ultrasound, that the hospital would likely send her home, and that she could just come to her scheduled office visit at 9:00 a.m. the following morning.

Mrs. Dean and her husband decided to continue to the hospital for an evaluation, where Mrs. Dean was seen by a nurse in the labor and delivery department.

The nurse took down Mrs. Dean's medical history, questioned her about her symptoms, and conducted a vaginal examination. Mrs. Dean explained to the nurse that she had dark, brown vaginal discharge, vaginal spotting, cramping, and urinary frequency and burning. The nurse noted from her vaginal examination that Mrs. Dean's cervix was not dilated and that she was having no contractions.

The nurse called Dr. Davis and spoke with him about the results of the examination. Dr. Davis did not come to the hospital to evaluate Mrs. Dean or order any diagnostic tests such as an ultrasound or urinalysis. He recommended that Mrs. Dean continue with bed rest and gave the nurse orders over the phone to discharge Mrs. Dean from the hospital. Mrs. Dean was told to follow-up the next morning with the Women's Health Center at her previously scheduled 9:00 a.m. office visit. The nurse told Mrs. Dean that Dr. Davis had diagnosed her with a urinary tract infection and checked a box on her discharge instructions for her to drink more fluids for such an infection.

*The August 1, 2007 Premature Delivery.* After her discharge from the hospital, Mrs. Dean experienced worsening symptoms throughout the night, including pelvic pressure, urinary frequency and burning, and lower abdominal pain. Early on the morning of August 1, 2007, Mrs. Dean called Dr. Davis and reported her worsening

symptoms, but Dr. Davis reiterated that he believed she had a urinary tract infection, that if she went to the emergency room again she would simply be sent back home, and that she should come to the office for her regular appointment at 9:00 a.m. that morning.

Mrs. Dean arrived at the Women's Health Center for her 9:00 a.m. appointment and was seen by another obstetrician in the group, who examined her and ordered an ultrasound. When the ultrasound showed increased cervical shortening from the previous July 25 ultrasound, the obstetrician diagnosed Mrs. Dean with "possible incompetent cervix" and recommended that Mrs. Dean go directly to the nearby office of Dr. Mark Boddy, a maternal fetal medicine specialist with whom obstetricians in the area routinely consulted. Before Mrs. Dean could see Dr. Boddy at his office, however, she was sent to the hospital labor and delivery department because of her increased complaints of pain.

At the hospital, Mrs. Dean went into premature labor, and Dr. Holliman delivered her baby by emergency Caesarian section that night because of the baby's transverse (or sideways) position. Postoperative hospital records listed Mrs. Dean's diagnosis as incompetent cervix. The baby was at a gestational age of 23 weeks, 4 days and weighed 1 pound, 4 ounces at the time of delivery. The baby subsequently died in

the hospital neonatal intensive care unit because of extreme prematurity. The pathology report found no signs of infection and listed incompetent cervix under Mrs. Dean's clinical history. A urinalysis performed on Mrs. Dean in the hospital tested negative for infection.

*The August 2, 2007 Physician Note.* On August 2, 2007, as Mrs. Dean was recovering in the hospital from her Caesarian section, Dr. Davis wrote a physician progress note at 10:00 a.m. reflecting that he had physically examined her (the "August 2 Physician Note" or "Note"). Mrs. Dean, however, had no memory of Dr. Davis ever coming into her room that day, and Mr. Dean testified that a different physician from the Women's Health Center visited his wife's hospital room on August 2, but not until that evening. Dr. Davis, at some unknown time after making the August 2 Physician Note, struck through the entire entry and wrote "error pt [patient] not seen[,] out of room" followed by his signature. In contrast, other medical records prepared by a nurse on August 2 reflect that Mrs. Dean and her husband had been in the hospital room that morning, and Mrs. Dean testified that she did not leave her hospital room that day.

*The August 4, 2007 Physician Note.* On August 4, 2007, Dr. Davis documented in his physician progress notes at 9:15 a.m. that he performed a physical exam of Mrs. Dean that included listening to her lungs and bowel sounds with a stethoscope and

7

checking her extremities for swelling. Mrs. Dean, however, testified that Dr. Davis had lifted up her patient gown and looked at her surgical incision, but had done nothing else that day to physically assess her condition. Mr. Dean, who was in the hospital room at the time, testified that Dr. Davis had simply looked under his wife's gown at the surgical incision, and that if the physician progress note documented a more thorough exam, it was inaccurate.

*Discharge from the Hospital and Subsequent Pregnancy.* On August 4, 2007, after Dr. Davis visited her hospital room, Mrs. Dean was discharged from the hospital. The discharge summary prepared by Dr. Davis listed incompetent cervix as the clinical reason for Mrs. Dean's hospitalization.

Mrs. Dean gave birth again in 2009. Mrs. Dean was seen by an obstetrician in a different practice, who administered progesterone and performed a cerclage to treat her condition of incompetent cervix. Mrs. Dean went into labor at 34 weeks and gave birth to a healthy baby.

*The Wrongful Death Suit.* In 2009, Mr. and Mrs. Dean, individually and as administrators of the estate of their deceased child, filed this medical malpractice action against several defendants, including the Davis Defendants, in which they sought damages for the wrongful death of their child and for the pain and suffering of their

child and Mrs. Dean.[4] Before trial, the Davis Defendants filed two motions in limine seeking to prevent the plaintiffs from presenting any evidence regarding the August 2 Physician Note. The plaintiffs responded that the August 2 Physician Note reflected false entries in the medical record by Dr. Davis that were probative of his character for untruthfulness and could be inquired into during his cross-examination under OCGA § 24-6-608 (b) (1). The trial court agreed with the plaintiffs and denied the motions.

At the ensuing jury trial, the plaintiffs' theory of the case with respect to the Davis Defendants was that in light of Mrs. Dean's medical history, symptoms, and July 25, 2007 ultrasound, Dr. Davis violated the standard of care on July 31 by failing to go to the hospital to examine Mrs. Dean and diagnose her condition of cervical incompetence. According to the plaintiffs, if Dr. Davis had come to the hospital and properly diagnosed Mrs. Dean with cervical incompetence, Dr. Davis then would have been required under the standard of care to have a cerclage performed or administer progesterone to prevent preterm delivery. The plaintiffs further contended that if Dr. Davis had taken these steps, Mrs. Dean's pregnancy would have been prolonged and

---

[4] Among other defendants, the plaintiffs also sued Dr. Holliman. The jury apportioned 50 percent of the fault to Dr. Holliman in its verdict, and the plaintiffs' claims against Dr. Holliman subsequently were resolved by a satisfaction of judgment entered in October 2015.

the premature delivery and death of her child would have been avoided. The Davis Defendants denied that Dr. Davis violated the standard of care or that any treatments or interventions on July 31 or August 1 could have avoided the outcome in this case.

At the close of all the evidence, the trial court heard several motions for directed verdict brought by the Davis Defendants. Among other things, the Davis Defendants sought a directed verdict on the ground that the plaintiffs had failed to prove that Dr. Davis's acts or omissions caused the premature delivery and death of the child. The trial court declined to enter a directed verdict on the issue of causation.

After hearing conflicting testimony of the parties, the various experts, and other witnesses, the jury found in favor of the plaintiffs and awarded over $4 million in damages. Following the entry of final judgment on the jury verdict, the Davis Defendants filed a motion for j. n. o. v. and for new trial, contending that the plaintiffs had failed to prove causation and that the trial court had erred in denying their motions in limine relating to the August 2 Physician Note. The trial court denied the motion in a detailed order, and this appeal by the Davis Defendants followed.

1. The Davis Defendants contend that the trial court erred in denying their motions for directed verdict and j. n. o. v. According to the Davis Defendants, the plaintiffs failed to present evidence to a reasonable degree of medical certainty that the

10

child's premature delivery and death could have been prevented by Dr. Davis, even if he had complied with the standard of care espoused by the plaintiffs' medical expert.

(a) As an initial matter, before turning to the merits of the Davis Defendants' enumerated error, we note that in addition to the live testimony of multiple experts and witnesses, excerpts from four videotaped depositions were played at the jury trial. The video recordings of the depositions, however, were not transmitted with the appellate record. And while the written transcripts of the entire depositions were included in the appellate record, the record is confusing and incomplete as to which particular portions of the depositions were played for the jury, and the parties have not addressed the issue in their appellate briefs. Rather, the plaintiffs and the Davis Defendants have simply cited to portions of the deposition transcripts in their briefs without any objection or comment from the opposing party.

Under these circumstances, in reviewing the Davis Defendants' enumeration of error, we have limited our consideration of the depositions to those portions cited by the parties without objection in their appellate briefs. To the extent that other portions of the depositions were played at trial and might have supported the arguments raised by the Davis Defendants on appeal, we point out that the Davis Defendants, as the appellants, "bore the burden of ensuring an accurate and complete record on appeal"

11

and of taking steps to have the record supplemented with any necessary materials. (Citation and punctuation omitted.) *Griffin Builders v. Synovus Bank*, 320 Ga. App. 307, 309 (739 SE2d 760) (2013). See *State v. Young*, 339 Ga. App. 306, 306, n.5 (793 SE2d 186) (2016) (citing Court of Appeals Rule 18 (b) and noting that the burden is on the appellant to ensure that a complete record is transmitted to this Court, including the transmission of audio and video recordings).

(b) We now turn to the merits of the Davis Defendants' claim that the trial court erred in denying their motions for a directed verdict and for j. n. o. v. on the issue of causation. "On appeal from the denial of a motion for a directed verdict or for j. n. o. v., we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict." (Citation and punctuation omitted.) *Park*, 307 Ga. App. at 845 (2)*.* A directed verdict or j. n. o. v. should not be granted "unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict." (Citation omitted.) *James E. Warren, M.D., P.C. v. Weber & Warren Anesthesia Svcs.*, 272 Ga. App. 232, 235 (2) (612 SE2d 17) (2005). In determining whether the record demanded a particular verdict, we "consider all relevant admissible evidence of record whether admitted or elicited during

12

the plaintiffs' case in chief or subsequent thereto." (Citation and punctuation omitted.) *Fowler v. Smith*, 230 Ga. App. 817, 819 (1) (b) (498 SE2d 130) (1998).

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

(Citations omitted.) *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191) (2005). See *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003). Medical negligence without proof of causation is insufficient to withstand a motion for directed verdict and j. n. o. v., and causation cannot be based on speculation or guesswork. *Walker*, 276 Ga. App. at 638 (1). "[T]here can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided." (Citations and punctuation omitted.) *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1) (500 SE2d 402) (1998).

Causation in a medical malpractice action must be established through expert testimony "because the question of whether the alleged professional negligence caused

13

the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." (Citation omitted.) *Zwiren*, 276 Ga. at 500. But "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." Id. at 503. And "[c]ausation may be established by linking the testimony of several different experts" and "must be determined in light of the evidentiary record as a whole." (Citation omitted.) *Walker*, 276 Ga. App. at 642 (1). Furthermore, it is well-established that "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Punctuation and footnote omitted.) *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014).

Applying these principles, we conclude that the plaintiffs came forward with evidence of causation and thus were entitled to have the jury decide the issue. At trial, the plaintiffs presented the expert testimony of Dr. Frank Bottiglieri, a board certified obstetrician-gynecologist who had delivered approximately 6,000 babies and performed over 75 cerclages during the course of his career. Dr. Bottiglieri testified that in light of the information available to Dr. Davis about Mrs. Dean's medical history and condition, Dr. Davis violated the standard of care by failing to go to the

hospital and personally examine Mrs. Dean on July 31, 2007, and by failing to properly diagnose her with cervical incompetence on that date. Dr. Bottiglieri further testified that if Dr. Davis had properly diagnosed Mrs. Dean with cervical incompetence on July 31, the standard of care would have required Dr. Davis to have a cerclage performed on Mrs. Dean or administer progesterone. The plaintiffs also presented evidence that all obstetricians are routinely trained to perform cerclages during medical school and that Dr. Davis had been shown how to perform the procedure, although he had not previously performed one on a patient.

With respect to the harm caused by Dr. Davis's failure to come to the hospital on July 31, diagnose Mrs. Dean with cervical incompetence, and develop a plan to have a cerclage performed or administer progesterone, Dr. Bottiglieri testified:

> Q: Do you have an opinion whether or not -- if Dr. Davis had come to the hospital and examined Katie in person, whether or not it would have made a difference in whether Katie and [her husband]'s baby lived or died?
>
> A: Would have made a difference if he did something, if he came up with a plan. I mean, yeah, it would have made a difference.
>
> Q: And how do you know it would have made a difference?

15

A: Because a stitch would have saved this pregnancy, as far as I'm concerned. You'd have prolonged those critical days. You just can't keep watching this progression. You have to do therapy. You have to do -- whether it be progesterone or a cerclage, you have to take action. We're running out of time. It's only getting worse with each ultrasound. There will be a point of no return, happened later. Have to do something. . . .

Q: The opinions that you've given us, Dr. Bottiglieri, regarding Dr. Davis and Katie's presentation at [the hospital] on 7/31/07, do you hold those to a reasonable degree of medical probability and certainty?

A: I do.[5]

Regarding the success of cerclages in increasing the changes of infant survival in at-risk pregnancies, the plaintiffs also presented the expert testimony of Dr. Brian Carter, who was board certified in pediatrics and neonatal / perinatal medicine. Dr. Carter testified that cerclages can be performed on a pregnant woman from 16 weeks to 25 weeks of pregnancy and that "the likelihood of gained time [before delivery of

---

[5] To the extent that Dr. Bottiglieri gave other, conflicting testimony that was more equivocal on the issue of causation, "the 'self-contradictory testimony rule' is not applicable to an expert witness," and it was the jury's role to resolve those conflicts. (Citation and punctuation omitted.) *Aleman v. Sugarloaf Dialysis*, 312 Ga. App. 658, 662 (2) (719 SE2d 551) (2011). See *Moore*, 326 Ga. App. at 811 (2) ("Contradictions go solely to the expert's credibility, and are to be assessed by the jury when weighing the expert's testimony.") (punctuation and footnote omitted).

16

the baby] would be in the order of two weeks to two months." Dr. Carter further testified regarding infant survival rates when premature delivery is postponed:

> A: [G]enerally speaking, from 28 weeks and about two pounds forward, there's a 90 percent chance of survival. . . .
>
> Q: Let me ask you, was that true in 2007?
>
> A: Yes, that was true in 2007. So if a baby -- if a pregnancy can make it to 28 weeks, and the baby weighed over two pounds, 900 grams, there's greater than 90 percent likelihood that a, the baby's going to survive . . . and b, would only have about a 15 percent likelihood of disability of any sort . . . . At 24 weeks, you're up to somewhere between 40 and 60 percent survival, at 25 weeks, you're certainly 50 to 60 on the low end to as high as 70 or 80, and at 26 weeks, you're pretty consistent 70 to 80 percent, and 27, 28 weeks, like I said, you're taking off, and have a far brighter future.

Dr. Carter further testified that a "two to four percent likelihood of survival is conferred on the fetus every day that he or she stays longer in the womb between 23 and 25 weeks," and that all of the statistics he had provided would be applicable to Mrs. Dean's baby:

> Q: Now, the statistics that you were giving us earlier about survival rates and percentages, if [Mrs. Dean's baby] had been able to stay in the womb

17

until let's say 25 or 26 weeks, 27 weeks, would you expect [the baby's] survival rate to match these statistics that you have given us?

A: Yes. I think anywhere across the states where modern neonatology is practiced, there's every reason to expect that type of outcome, and having practiced in Georgia before, I know here in Macon, there's good capability for taking care of premature babies.

Q: Did you see anything about the medical records as it relates to [the baby] that would suggest to you that he would not have been able to match those statistics?

A: No, sir. I saw no evidence for him not matching those statistics.

Dr. Carter testified that his opinions and testimony were to a reasonable degree of medical probability.

Regarding the success of administering progesterone to prevent preterm birth, Dr. Davis conceded on cross-examination that "the recent studies and the current thinking is that [progesterone] does make a difference in preterm birth." Additionally, Dr. Davis's expert, Dr. Jonathan Weeks, admitted that he was one of the authors of a paper entitled "Vaginal Progesterone is Associated with a Decrease in Risk of Early Preterm Birth and Improved Neonatal Outcome in Women with a Short Cervix: a Secondary Analysis from a Randomized Double-Blind Placebo Controlled Trial,"

which was published in August 2007. Dr. Weeks' paper concluded that "vaginal progesterone may reduce the rate of early pre-term birth and improve neonatal outcome in women" with a short cervical length revealed in ultrasounds. Moreover, Dr. Weeks acknowledged that a prior study referenced in his 2007 paper had found that "[p]rogesterone treatment was associated with a significant reduction in pre-term birth at less than 34 weeks," and that "women with a short cervical length identified in midtrimester by transvaginal [ultrasound] are less likely to deliver preterm if they are treated with vaginal progesterone."

Based on this combined expert testimony, construed in the light most favorable to the plaintiffs with all inferences drawn in their favor, we conclude that the plaintiffs presented evidence from which a jury could find that if Dr. Davis had followed the standard of care on July 31, 2007 by having a cerclage performed on Mrs. Dean or administering progesterone, there was a reasonable medical probability that it would have postponed the birth of Mrs. Dean's baby to a point in time when the baby would have survived. Based on the record before us, we cannot say that the evidence regarding causation was so "clear, plain, palpable and undisputed" as to demand a verdict in favor of the Davis Defendants. (Punctuation and footnote omitted.) *Moore*, 326 Ga. App. at 809 (1). See *Walker*, 276 Ga. App. at 638-642 (1) (reversing grant of

19

directed verdict to defendant physicians where plaintiffs presented evidence that the physicians' deviations from the standard of care caused the premature birth and death of the baby "by linking the testimony of several different experts" and reviewing "the evidentiary record as a whole").

In arguing that the record demanded a verdict in their favor because of insufficient evidence of causation, the Davis Defendants rely on *Reeves v. Mahathre*, 328 Ga. App. 546 (759 SE2d 926) (2014). *Reeves* was a wrongful death suit where the plaintiffs sued an emergency room physician and his practice for failing to properly diagnose and treat a blockage in the decedent's kidney caused by a kidney stone, allegedly resulting in the decedent's septic shock and death. Id. at 547-548. The plaintiffs' expert testified that the defendant physician would have met the standard of care if he had ordered a CT scan, had properly diagnosed the decedent's kidney blockage, and had then consulted with a urologist and followed the urologist's instructions regarding the treatment of the decedent. Id. at 549. However, the urologist who would have been consulted on the night in question testified that, if the defendant physician had performed a CT scan and consulted with him about the results, he would have advised the physician to treat the decedent "in the exact fashion that [the physician], in fact, did." Id. We concluded that in light of the urologist's testimony and

20

the plaintiffs' failure to present any expert testimony contradicting it, the plaintiffs had failed as a matter of law to prove that the defendant physician's violation of the standard of care proximately resulted in the decedent's death. Id. at 550.

Relying on *Reeves*, the Davis Defendants maintain that the plaintiffs' expert, Dr. Bottiglieri, essentially testified that Dr. Davis could have met the standard of care by consulting a maternal fetal medicine specialist on July 31, 2007 and following the specialist's recommendations. The Davis Defendants further emphasize that Dr. Boddy, the maternal fetal medicine specialist with whom Dr. Davis would have consulted on July 31, 2007 if he had sought a consultation, testified that he would not have recommended that a cerclage be performed or progesterone be administered to Mrs. Dean. Based on Dr. Bottiglieri and Dr. Boddy's testimony, the Davis Defendants contend that *Reeves* is factually on point and controls the outcome here.

The Davis Defendants' reliance on *Reeves* is misplaced. As an initial matter, one of the three appellate judges in *Reeves* concurred only in the judgment, and thus the case is physical precedent only and not binding on this Court. See Court of Appeals Rule 33 (a); *Groth v. Ace Cash Express*, 276 Ga. App. 350, 353 (623 SE2d 208) (2005). In any event, *Reeves* is factually distinguishable. Unlike in *Reeves*, the plaintiffs' expert, Dr. Bottiglieri, testified that Dr. Davis would have met the standard

21

of care by performing a cerclage on Mrs. Dean, having another physician perform the cerclage, or administering progesterone. Dr. Bottiglieri also testified that he "would expect anyone, whether it be a maternal fetal medicine specialist or a generalist to either consider the cerclage or do the progesterone" in this case, **v38. 12** and that if a specialist was consulted and declined to do a cerclage, Dr. Davis could have disagreed with the specialist and would have needed to make the "final decision" about his patient's care. Hence, this is not a case where the sole testimony of the plaintiff's expert was that the standard of care could be met by the physician simply consulting a specialist and then following the specialist's recommendations. Therefore, *Reeves* is not controlling.

Accordingly, for all these reasons, the evidence did not demand a finding in favor of the Davis Defendants on the issue of causation, and the matter was properly submitted to the jury for resolution. The trial court thus committed no error in denying the Davis Defendants' motions for directed verdict and j. n. o. v.

2. The Davis Defendants also contend that the trial court should have granted their motion for new trial. According to the Davis Defendants, a new trial was warranted because the trial court abused its discretion by denying their motions in

22

limine seeking to exclude any evidence of the August 2 Physician Note. More specifically, the Davis Defendants contend that the trial court erred in concluding that evidence regarding the August 2 Physician Note was probative of Dr. Davis's untruthfulness under OCGA § 24-6-608 (b) (1) ("Rule 608") because the Note involved an innocent mistake rather than deliberate deception. The Davis Defendants also maintain that the August 2 Physician Note was not relevant to any issues raised in the case and that the plaintiffs introduced evidence of the Note simply to attack Dr. Davis's general character. Consequently, the Davis Defendants contend that the probative value of the Note was not substantially outweighed by the danger of unfair prejudice and thus should have been excluded under OCGA § 24-4-403 ("Rule 403").

"If evidence is admissible for any purpose, its admission will not cause a new trial." (Citation and punctuation omitted.) *West v. West*, 199 Ga. 378, 387 (4) (34 SE2d 545) (1945).

> We review the trial court's decisions on the admissibility of evidence, including a denial of a motion in limine, for an abuse of discretion. And motions in limine should only be granted with great care and when there is no circumstance under which the evidence at issue could be admissible at trial[.] By its very nature, the grant of a motion in limine excluding evidence suggests that there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial. In light of that absolute

23

the grant of a motion in limine excluding evidence is a judicial power which must be exercised with great care.

(Citations and punctuation omitted.) *One Bluff Drive v. K. A. P., Inc.*, 330 Ga. App. 45, 51-52 (3) (766 SE2d 508) (2014).

The Davis Defendants have failed to show that the trial court abused its discretion in concluding that evidence regarding the August 2 Physician Note was admissible under Rule 608 (b) (1) and in denying their motion in limine to exclude any reference to the Note at trial. Under Rule 608 (b) (1) of Georgia's revised Evidence Code,[6] a trial court may allow questioning about specific instances of conduct by a witness on cross-examination, if the conduct is probative of the witness's character for truthfulness or untruthfulness. OCGA § 24-6-608 (b) (1).[7] See *Gaskin v. State*, 334 Ga.

---

[6] Because the trial in this case occurred in April 2015, Georgia's revised Evidence Code, effective January 1, 2013, applies. See Ga. Laws 2011, Act 52, § 101 (revised evidence code "shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date").

[7] OCGA § 24-6-608 (b) (1) provides:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than a conviction of a crime as provided in Code Section 24-6-609, or conduct indicative of the witness's bias toward a party may not be proved by extrinsic evidence. Such instances may however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness:

App. 758, 761-763 (1) (a) (780 SE2d 426) (2015) (discussing Rule 608 (b)). However,

a party "may not use impeachment as a guise for submitting to the jury substantive

evidence that is otherwise unavailable." (Citation and punctuation omitted.) *Gaskin*,

334 Ga. App. at 763 (1) (a). Thus, the specific instances of conduct must involve **"**acts

probative of untruthfulness," including "misconduct such as perjury, fraud, swindling,

forgery, bribery, and embezzlement." (Citations and punctuation omitted.) Id. See

*United States v. Morgan*, 505 F3d 332, 340 (II) (C) (2) (5th Cir. 2007); *United States

v. Novaton*, 271 F3d 968, 1006 (II) (F) (11th Cir. 2001).[8] We will reverse a trial court's

ruling regarding whether specific instances of conduct fall within the ambit of Rule 608

(b) only if there is a clear abuse of discretion. *Gaskin*, 334 Ga. App. at 762 (1) (a).

Applying these principles, we conclude that the trial court acted within its broad

discretion in finding that the August 2 Physician Note was probative of Dr. Davis's

character for untruthfulness. As previously noted, Dr. Davis originally charted in his

(1) Concerning the witness's character for truthfulness or untruthfulness[.]

[8] "[B]ecause the provisions of OCGA § 24-6-608 borrowed from the Federal Rules of Evidence, we look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit." (Citations, punctuation, and footnote omitted.) *Gaskin*, 334 Ga. App. at 762 (1) (a).

25

August 2 Physician Note that he had physically examined Mrs. Dean at the hospital on that date, and then, at some unknown time after making the Note, Dr. Davis struck through the entire entry and wrote "error pt [patient] not seen[,] out of room." However, other hospital records prepared by a nurse and introduced without objection during the trial reflect that Mrs. Dean was in her hospital room and could have been examined by Dr. Davis, had he in fact chosen to do so on August 2, and Mrs. Dean confirmed that she did not leave her hospital room that day. Furthermore, Dr. Davis's original charting and subsequent revision to the August 2 Physician Note occurred against the backdrop of Dr. Davis having previously failed to examine and treat Mrs. Dean on the evening of July 31 and early morning of August 1.

Under these circumstances, the trial court was authorized to find that the jury could reasonably decide that Dr. Davis's August 2 Physician Note involved deliberate deception rather than simply a mistake. We therefore cannot say that the court abused its discretionary authority by allowing inquiry into the Note during Dr. Davis's cross-examination for purposes of probing his character for untruthfulness.[9]

---

[9] Rule 608 (b) provides that if the witness denies the specific bad act on cross-examination that bears on the witness' character for untruthfulness, the act "may not be proved by extrinsic evidence and the questioning party must take the witness' answer, unless the evidence would be otherwise admissible as bearing on a material

Nor did the trial court abuse its discretion in finding that the probative value of evidence regarding the August 2 Physician Note was not substantially outweighed by the danger of unfair prejudice. Rule 403 provides in part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," but Rule 403 is "an extraordinary remedy which the courts should invoke sparingly, and the balance should be struck in favor of admissibility." (Citation omitted.) *Kim v. State*, 337 Ga. App. 155, 158 (786 SE2d 532) (2016).

---

issue of the case." (Citation omitted.) *United States v. Matthews*, 168 F3d 1234, 1244 (II) (11th Cir. 1999). See *Gilmer v. State*, 339 Ga. App. 593, 599 (2) (c) (794 SE2d 653) (2016). During trial, the plaintiffs introduced into evidence all of Mrs. Dean's medical records of her hospitalization from August 1 to August 4, 2007, including all of the physician notes and nurse records for August 2, and both plaintiffs also testified about the care and treatment received by Mrs. Dean at the hospital on August 2. Hence, extrinsic evidence was introduced that went to the falsity of the August 2 Physician Note beyond the testimony of Dr. Davis on the issue. However, in their appellate briefing, the Davis Defendants have not challenged the use of this extrinsic evidence at trial and thus have abandoned any argument in that regard. See *Leatherwood v. State*, 212 Ga. App. 342, 345 (5) (441 SE2d 813) (1994) (evidentiary issues not argued on appeal "are deemed abandoned"). Furthermore, Mrs. Dean's hospital records, and the testimony of Mrs. Dean and her husband about her care and treatment (or lack thereof) during her hospital stay, were material to Mrs. Dean's substantive claim for her own pain and suffering arising out of the alleged medical malpractice. Thus, the extrinsic evidence was admissible on the independent ground that it bore "on a material issue of the case." *Matthews*, 168 F3d at 1244 (II).

The "extraordinary remedy" of exclusion of the August 2 Physician Note under Rule 403 was not demanded under the circumstances of this case, where the accuracy of Dr. Davis's physician notes and his credibility were hotly disputed. At trial, Dr. Davis repeatedly testified that he could not personally remember his conversations with Mrs. Dean on the telephone leading up to the premature delivery of her baby. Instead, Dr. Davis relied on the accuracy of his transcribed physician notes of his July 31, 2007 and August 1, 2007 conversations with Mrs. Dean as providing a true account of their conversations and his recommendations to her.

Mrs. Dean's testimony of her conversations with Dr. Davis, however, conflicted in several material respects with Dr. Davis's physician notes from July 31 and August 1. For example, Mrs. Dean testified that during her conversation with Dr. Davis on the evening of July 31, he discouraged her from going to the hospital emergency room after noticing the dark, brown discharge, but Dr. Davis's note stated, "I suggested the patient go to the hospital to be evaluated." Mrs. Dean further testified that during her telephone conversation with Dr. Davis on the morning of August 1, he reiterated to her his belief that she had a urinary tract infection and told her to come to the office for her regularly scheduled appointment at 9:00 a.m., but Dr. Davis's note made no reference

to a urinary tract infection and stated that he gave Mrs. Dean the option of coming to the office earlier that morning when it first opened.

In light of these circumstances, the accuracy of Dr. Davis's physician notes regarding his interactions with Mrs. Dean and his character for truthfulness or untruthfulness were clearly relevant, and the trial court was authorized in its discretion to strike the balance in favor of admissibility and find that the probative value of the August 2 Physician Note outweighed the risk of any unfair prejudice. Accordingly, the trial court did not abuse its discretion in denying the Davis Defendants' motion in limine on the ground that inquiry into the Note during the cross-examination of Dr. Davis was permissible under Rule 608 (b) (1).[10]      *Judgment affirmed. McMillian and Mercier, JJ., concur.*

[10] The Davis Defendants also argue that the plaintiffs' questioning of Dr. Davis about the August 2 Physician Note during his cross-examination was excessive and showed that the plaintiffs were simply trying to impugn Dr. Davis's general character before the jury. But control over the length and scope of cross-examination is a matter within the sound discretion of the trial court. See *Lott v. Hatcher*, 275 Ga. App. 424, 424 (620 SE2d 651) (2005). Here, the trial court acted within its discretion in concluding that the length and scope of the plaintiffs' questioning of Dr. Davis about the August 2 Physician Note was not excessive, given that the accuracy of Dr. Davis's notes and his character for truthfulness or untruthfulness were of central import to the parties' different versions of what transpired before Mrs. Dean prematurely delivered her baby.