**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, P. J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 6, 2025**

# In the Court of Appeals of Georgia

A24A1536, A24A1722. SHAW v. SMITH; and vice versa.

RICKMAN, Presiding Judge.

These related appeals arise from a negligence and malpractice action filed by Khaliah Monique Shaw against Linda Smith and several other defendants. In Case No. A24A1536, Shaw contends that the trial court erred in entering its judgment, reduced for apportionment, and in denying Shaw's motion to enter judgment for the full amount of the verdict. In Case No. A24A1722, Smith argues that the trial court erred in denying her motion for a directed verdict and motion for judgment notwithstanding the verdict. For the reasons that follow, we affirm in both cases.

"On appeal from the denial of a motion for a directed verdict or for j.n.o.v., we construe the evidence in the light most favorable to the party opposing the motion[.]"

(Citation and punctuation omitted.) *Central Ga. Women's Health Center v. Dean*, 342 Ga. App. 127, 133 (1) (b) (800 SE2d 594) (2017). So viewed, the evidence shows that on December 19, 2013, Shaw sought treatment for depression at River Edge Behavioral Health Center. The next day, Julie Sanders, a nurse practitioner, prescribed Lamictal (lamotrigine) for Shaw.

The manufacturer's prescribing information for Lamictal contains a black box warning that Lamictal "can cause a severe, life-threatening rash including Stevens-Johnson syndrome and toxic epidermal necrolysis." The prescribing information also warns that "to avoid an increased risk of rash, the recommended initial dose and subsequent dose escalations should not be exceeded[.]"

The manufacturer of Lamictal recommends that the dosage of the drug be started low and increased gradually — 25 milligrams per day for the first two weeks, and 50 milligrams per day for weeks three and four. The manufacturer recommends an increase to 100 milligrams per day for week five.[1]

Shaw's December 20 prescription for Lamictal was for one 25-milligram tablet each day for the first week, followed by two 25-milligram tablets each day for the next

---

[1] The recommended dosage schedule was frequently referred to at trial as a "titration schedule."

three weeks. Sanders did not inform Shaw about potential side effects of the medication. The prescription was sent to the pharmacy at River Edge and filled by Smith, an independent contractor who worked as a pharmacist at River Edge. Shaw went to the River Edge pharmacy and picked up the medication. No one at the pharmacy advised Shaw about any side effects of Lamictal or offered counseling.

On January 6, 2014, Shaw returned to River Edge and saw Sanders again. During that visit, Sanders informed Shaw that she should increase her daily dose of Lamictal to 100 milligrams starting the next day. Sanders told Shaw to take four 25-milligram tablets per day until her supply of those ran out, and then begin taking one 100-milligram tablet each day from a new prescription. The new prescription was sent to the River Edge pharmacy on January 6, and Smith saw the prescription and checked the dosage that day. Shaw picked up the 100-milligram tablets from the River Edge pharmacy on January 13, four days before she would have been scheduled to start taking a 100-milligram dose under the manufacturer's recommended schedule. Again, no one at the pharmacy warned Shaw about side effects or offered counseling.

Shaw began feeling tired on January 13, the same day she picked up the 100-milligram tablets. On January 15, she started feeling sick, like she was "coming down

3

with the flu." By January 18, Shaw was in an intensive care unit and had been intubated. She was diagnosed with Stevens-Johnson syndrome and toxic epidermal necrolysis. Shaw was transferred to Grady Memorial Hospital on January 19, where she remained for six weeks. Shaw has required multiple surgeries, has permanently lost all of her fingernails and all but one of her toenails, and her hair cannot fully grow back due to scarring. Shaw developed severe vision problems and sensitivity to light.

In 2017, Shaw filed a complaint in the State Court of DeKalb County against five named defendants[2] - Smith, River Edge, Dr. Debra Osborne (Sanders's supervising physician), Affordable Business Solutions, LLC ("ABS") (Dr. Osborne's employer), and Dajo, Incorporated (Dr. Osborne's company). Shaw asserted claims for, inter alia, negligence and malpractice. River Edge was dismissed from the case, which was then transferred to the State Court of Bibb County. The trial court subsequently entered a consent judgment in the amount of $800,000 in favor of Shaw against ABS. The trial court later entered a consent order dismissing Dr. Osborne and Dajo, Inc., from the case.

---

[2] Shaw's complaint also included unnamed "John Doe" defendants.

One of Shaw's expert witnesses, Dr. Joseph Calabrese, a medical doctor, testified that it was his opinion, to a reasonable degree of medical probability, that the incorrect titration of Lamictal caused Shaw's Stevens-Johnson syndrome and the life-threatening rash, and was completely avoidable. According to Dr. Calabrese, Smith should have realized that the prescription was incorrectly written and should have communicated with the provider, who would have then understood that the titration schedule was incorrect "and all of this wouldn't have happened."

Another of Shaw's expert witnesses, Dr. Matthew Perri, a professor and pharmacist at the University of Georgia College of Pharmacy, testified that the combination of taking Lamictal at too high a dose in too rapid an escalation caused Shaw's Stevens-Johnson syndrome and toxic epidermal necrolysis. He testified that Smith should not have filled either the December 20 or the January 6 prescriptions as written. Dr. Perri explained that the December 20 prescription, which started with a dose of 25 milligrams for the first week and increased to 50 milligrams after only one week, was twice the dose it should have been for the second week, and that the dose should not have been increased to 100 milligrams until week five. If the manufacturer's guidelines are followed, according to Dr. Perri, "there's virtually no

chance you're going to have a problem[,]" but increasing the dose too rapidly causes problems. Dr. Perri stated, "You can get a rash and that rash can be severe, including leading to death."

Dr. Perri testified that when Smith received the January 6 prescription, she should have assumed that it was going to be filled that day unless she had information that led her to believe otherwise. Dr. Perri stated that for both the December 20 prescription and the January 6 prescription, Smith should have called the prescriber and explained the problem. According to Dr. Perri, the prescriber probably would have agreed to fix the problem. He explained, "in my experience, that's what happens and that would have solved the problem. That would have avoided the entire situation." Dr. Perri testified that if Smith had called Sanders and she did not change the prescription, Smith should have called Dr. Osborne to let her know about the problem, and if Dr. Osborne wanted the prescription filled as written, Smith should have refused to fill it.

Dr. Osborne testified that she would not have allowed Sanders to prescribe 25 milligrams of Lamictal for the first week and 50 milligrams for the next three weeks if she had known about it.

Smith moved for a directed verdict on the issue of causation, which the trial court denied. The jury found in favor of Shaw in the amount of $40,309,502.97 and apportioned two percent fault to Smith, eighteen percent fault to ABS, and eighty percent fault to River Edge. Shaw filed a motion for the trial court to enter a judgment against Smith for the full amount of the jury's verdict, which the trial court later denied. The trial court entered judgment against Smith in the amount of $806,190.06, which is two percent of $40,309,502.97. Smith filed a motion for judgment notwithstanding the verdict, which the trial court also denied.

These appeals followed.

*Case No. A24A1536*

1. Shaw argues that the trial court erred by entering its judgment, reduced for apportionment, and by denying her motion to enter judgment for the full amount of the verdict. Shaw contends that OCGA § 51-12-33 (b) does not apply because this was a case brought against a single defendant. We disagree.

At the time Shaw filed her complaint, OCGA § 51-12-33 (b) (2005) provided that

> [w]here an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total

7

amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person.

As previously indicated, River Edge, Dr. Osborne, and Dajo Inc. were dismissed from the case prior to trial, and the trial court entered a consent judgment in favor of Shaw against ABS. Shaw contends that, as a result, at the time of trial, this action was being brought against a single named defendant, Smith. However, although the consent judgment against ABS provided that "[t]here are no further issues to litigate between" Shaw and ABS and "ABS is therefore excused from having to further participate in this case including trial[,]" the pre-trial order expressly stated that "[a]lthough it does not appear in the caption and has been excused from further participating in this case, including trial, per the Court's June 6, 2018 Order, [ABS] is technically still a party, having entered a consent judgment." Thus, the record shows that ABS was a defendant at the time of trial. "Even if the consent judgment insulated [ABS] from any real threat of liability, it did not remove [ABS] from the case .... [T]he entry of a consent judgment does not equate with a discharge from liability or dismissal...." *Bostick v. CMM Properties*, 327 Ga. App. 137, 139 (1) (755 SE2d 895)

(2014), rev'd on other grounds by *Bostick v. CMM Properties*, 297 Ga. 55 (772 SE2d 671) (2015). Accord *Nalley v. Baldwin*, 261 Ga. App. 713, 715 (583 SE2d 544) (2003). Consequently, "this is not a single tortfeasor case and the trial court was required to follow the parameters of the applicable version of the apportionment statute." *Southern Oil Refinery v. Price*, 372 Ga. App. 427, 430 (2) (903 SE2d 693) (2024). The trial court thus did not err by entering its judgment, reduced for apportionment, or by denying Shaw's motion to enter judgment for the full amount of the verdict.

2. Because of our decision in Division 1, we need not address Shaw's other arguments.

*Case No. A24A1722*

3. Smith contends that the trial court erred by denying her motion for a directed verdict and motion for judgment notwithstanding the verdict because Shaw's injuries are not legally traceable to Smith's alleged breach of the standard of care. We discern no reversible error.

In considering the denial of a motion for summary judgment or a motion for judgment notwithstanding the verdict, "the standard of review is whether there is any

9

evidence to support the jury's verdict." (Citation and punctuation omitted.) *Dean*, 342 Ga. App. at 133 (1) (b).

(a) First, Smith argues that even if she breached the standard of care, there is no evidence that it would have made a difference in Shaw's treatment. Smith argues that Sanders exercised her clinical judgment to intentionally deviate from the titration schedule and would not have changed the prescription if Smith had called her. However, Dr. Perri testified that if Smith had called Sanders and Sanders did not change the prescription, Smith should have called Dr. Osborne to let her know about the problem. And Dr. Osborne testified that, if she had known about it, she would not have allowed Sanders write the incorrect Lamictal prescription. Dr. Perri also testified that if calling Dr. Osborne did not fix the problem, Smith should have refused to fill the prescription. Thus, there was at least some evidence that Smith's breach of the standard of care made a difference in Shaw's treatment. See *Dean*, 342 Ga. App. at 137-138 (1) (b) (affirming denial of motions for directed verdict and j.n.o.v. where plaintiffs presented some evidence of causation).

(b) Next, Smith argues that there is no evidence that she caused Shaw to take more pills than originally prescribed during weeks three and four of her treatment.

Smith testified that she did not know that Sanders told Shaw on January 6 to take more than the originally prescribed amount, and contends that she, therefore, could not have caused Shaw to take more pills than originally prescribed during weeks three and four of her treatment. However, Dr. Calabrese testified if Smith had communicated with Sanders, Sanders would have then understood that the titration schedule was incorrect "and all of this wouldn't have happened." And Dr. Perri testified that if Smith had communicated with Sanders, "that would have solved the problem. That would have avoided the entire situation." We thus conclude that there is at least some evidence that Smith's breach of the standard of care caused Shaw to take more pills than originally prescribed during weeks three and four of her treatment. See *Dean*, 342 Ga. App. at 137-138 (1) (b).

(c) Finally, Smith argues that Shaw's expert witness testimony was too speculative to establish causation because it did not distinguish between the two time periods that Shaw exceeded the manufacturer's recommended dosage.[3] Smith's

---

[3] Shaw contends the expert witness testimony issue is the only ground that Smith preserved for appellate review because this was the only ground raised in her motions for directed verdict and for j.n.o.v. However, "a party who moved for a directed verdict as to a specific claim will be entitled to a judgment as a matter of law on that claim if she prevails on her argument on appeal that the evidence is insufficient to support the verdict as to that claim." (Citation and punctuation omitted.) *Redmon*

argument is based on her contention that she had no role in Shaw taking too much Lamictal in weeks three and four of her treatment. Under the circumstances of this case, where there is at least some evidence that Smith's negligence caused Shaw to take too much Lamictal in both time periods, the fact that the expert witnesses did not specify which time period resulted in Shaw's injuries does not make their testimony too speculative to establish that Smith caused Shaw's injuries. See *Allen v. Family Med. Center*, 287 Ga. App. 522, 525 (1) (652 SE2d 173) (2007) (expert testimony that plaintiff's injury could have been avoided if defendants had followed standard of care sufficient to establish causation).

*Judgments affirmed. Mercier, C. J., and McFadden, P. J., concur.*

---

*v. Daniel*, 335 Ga. App. 159, 163 (1), n.5 (779 SE2d 778) (2015). Because Smith moved for a directed verdict on Shaw's negligence claim, she is "free to challenge the sufficiency of the evidence as to that claim, even if [she] did not raise in the court below the specific arguments set forth on appeal." Id.