**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 26, 2018**

# In the Court of Appeals of Georgia

A17A1982. BELCHER v. STATE.

DILLARD, Chief Judge.

Following trial, a jury convicted Norris Kang Belcher of armed robbery, kidnapping with bodily injury, hijacking a motor vehicle, possession of a firearm during the commission of a felony, financial-transaction-card fraud, battery, and possession of a firearm by a convicted felon during a crime. Belcher appeals from these convictions, arguing that (1) the evidence was insufficient to sustain his convictions, and (2) the trial court erred by permitting certain testimony. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's guilty verdict,[1] the record shows that on November 14, 2014, Belcher, while at his mother's house, was overheard saying that he wanted to rob someone at gunpoint. And later that night, Belcher—along with co-defendants Shaquille Smith and Derrius Partee—went to a house party in Walton County, Georgia, where they encountered the victim playing a card game.

At some point during the party, the victim left the card game to retrieve some money from his vehicle, and while doing so, he saw the three defendants outside. The victim then reentered the house and continued playing cards before suddenly hearing the alarm go off on his vehicle. When he went to turn off the alarm, the victim again saw the three defendants, who asked him whether it was his vehicle. After disengaging the alarm and returning to the card game, the victim, who suspected that something was amiss, informed a friend that he would be leaving shortly.[2]

---

[1] *See, e.g.*, *Sowell v. State*, 327 Ga. App. 532, 534 (759 SE2d 602) (2014).

[2] While Belcher and the co-defendants were at the party, Partee was observed looking at his cell phone, which he left inside the house at one point when he went outside with Belcher and Smith. Other party guests looked at this phone when it was left unattended and saw text messages that referenced a plan to commit a robbery. After these text messages were read, the party was abruptly ended by the concerned host, and his guests all left.

2

When the victim returned to his car a final time in order to leave, he had around $200 to $300 that he won playing cards. And once again, he was approached by the defendants. They asked the victim for a ride, but he refused to give them one. At this point, the defendants forced the victim into the backseat of his vehicle at gunpoint. Belcher got into the backseat with the victim, while Smith sat in the front-passenger seat and Partee drove. During the drive, Belcher pointed the gun at the victim's side and threatened to shoot him in the same place that he had been shot—telling the victim that he would "feel the same thing that [Belcher] felt."

The victim was then taken to another location under threats that he would be shot and with warnings not to "try anything." While there, the defendants began to rummage through his car. The victim—whose phone had been destroyed by the defendants prior to being driven away from the house party—was severely beaten by the defendants, who took a variety of items from him (including his child's social-security card and birth certificate). He was then forced back into his vehicle and driven by the defendants to a bank. There, Partee used the victim's ATM card to withdraw money from the ATM, and the machine took photographs during the withdrawal.

3

After a visit to the bank, the defendants drove the victim to a deserted location where a struggle ensued inside of the vehicle. The victim managed to take possession of the firearm, but he was unable to fire it at his attackers. The scuffle then spilled out of the vehicle, and the victim was once again severely beaten by the defendants. The victim was forced back into the car again and driven back to the first location. The defendants then wiped down the vehicle and placed the victim into the trunk at gunpoint. He remained in the trunk while the defendants drove to a number of unidentified locations. When the victim was finally removed from the trunk, he was again beaten before being released with his car. The victim's injuries were so severe that he threw up blood and was transported to a hospital via ambulance after successfully making it home to his mother's house. He remained in the hospital overnight.

The victim did not know Belcher and Smith before the night in question, but he knew Partee and subsequently recognized Belcher in a Facebook photograph. He later testified that he "knew for a fact" that the person in the picture was the individual who sat next to him in the backseat of the vehicle. The victim showed the

4

picture to law enforcement while he was still in the hospital, thus identifying Belcher as one of the perpetrators not long after the attack. Belcher was thereafter arrested, and law enforcement noticed his scar from a gunshot wound that matched the victim's description. After his arrest, Belcher contacted an acquaintance and advised her that he had been arrested and told law enforcement that he was with her on the night of the incident, which she later testified was not true.

Following a joint trial of the three defendants, Belcher was convicted of armed robbery, kidnapping with bodily injury, hijacking a motor vehicle, possession of a firearm during the commission of a felony, financial-transaction-card fraud, battery, and possession of a firearm by a convicted felon during a crime. He now appeals from these convictions, following the denial of his motion for new trial.[3]

When a criminal conviction is appealed, the appellant no longer enjoys a presumption of innocence.[4] And the relevant question is whether, after reviewing the

---

[3] Partee and Smith are not parties to this appeal.

[4] *Arbegast v. State*, 332 Ga. App. 414, 415 (1) (773 SE2d 283) (2015); *Westbrooks v. State*, 309 Ga. App. 398, 399 (1) (710 SE2d 594) (2011).

evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[5] We do not weigh the evidence or determine witness credibility, and the jury's verdict will be upheld so long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case.[6] With these guiding principles in mind, we turn now to Belcher's enumerations of error.

1. Belcher argues that the evidence was insufficient to sustain his convictions. We disagree.

Belcher's only argument as to the sufficiency of the evidence is that the "sole proof" of his involvement came from "the identification of the witness," *i.e.*, the victim's identification of Belcher as the perpetrator who sat with him in the backseat of the car and threatened to shoot him in his side. Belcher argues that eyewitness identifications "have been cited as the source of 70% of the convictions overturned

---

[5] *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[6] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001); *Westbrooks*, 309 Ga. App. at 399-400 (1).

for DNA evidence," and he provides a web address for the Innocence Project as his only supporting citation. He continues to generally attack the victim's identification of Belcher as the perpetrator, again providing no citation to *binding legal authority*.[7] But it is well established that the "testimony of a single witness is generally sufficient to establish a fact."[8] And Belcher essentially asks this Court to second-guess the victim's credibility. This, we will not do. As previously noted, this Court is not at liberty to weigh the evidence or determine witness credibility.[9] Instead, we will uphold a jury's verdict so long as some competent evidence, even though contradicted, supports each fact necessary to prove the State's case.[10]

---

[7] *See* COURT OF APPEALS RULE 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

[8] OCGA § 24-14-8; *accord Epperson v. State*, 340 Ga. App. 25, 32 (2) (796 SE2d 1) (2016).

[9] *Miller*, 273 Ga. at 832; *Westbrooks*, 309 Ga. App. at 399-400 (1).

[10] *Miller*, 273 Ga. at 832; *Westbrooks*, 309 Ga. App. at 399-400 (1).

Furthermore, in addition to the victim's testimony, the State also presented circumstantial evidence of guilt. Indeed, as discussed in detail *supra*, Belcher was overheard to say on the night in question that he wanted to commit a robbery; Belcher attended the party with Smith and Partee; witnesses testified to Partee's cell phone containing text messages that referenced a plan to commit a robbery at the party; the ATM machine documented the relevant withdrawal of stolen money, including photographing the individual withdrawing the funds (who the victim testified was Partee); Belcher was observed by law enforcement as having gunshot scars on the area of the body that was consistent with the victim's story of the back-seat perpetrator's threats; and Belcher attempted to persuade an acquaintance to provide him with a false alibi.[11]

---

[11] *See Olds v. State*, 293 Ga. App. 884, 886 (1) (668 SE2d 485) (2008) ("[Although] mere presence at the scene of the commission of a crime is not sufficient evidence to convict one of being a party thereto, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." (punctuation omitted)); *Stuart v. State*, 267 Ga. App. 463, 464 (1) (600 SE2d 629) (2004) (holding that evidence was sufficient to sustain conviction for financial-transaction-card fraud as a party to the crime when defendant intentionally aided and abetted same); *Henry v. State*, 178 Ga. App. 127, 127-28 (1) (342 SE2d 499) (1986) (holding that evidence was sufficient to sustain conviction when scar on defendant's body was consistent with victim's identification of defendant as perpetrator and her account of having cut the defendant on that part of his body during attack); *Duke v. State*, 176 Ga. App. 125, 126-27 (1) (335 SE2d 400) (1985) (holding that defendant's attempt to influence another person to give

Having considered the facts of this case, we conclude that the direct and circumstantial evidence was sufficient to sustain Belcher's convictions for armed robbery,[12] kidnapping with bodily injury,[13] hijacking a motor vehicle,[14] possession of

---

false testimony to establish an alibi was circumstantial evidence of his guilt of having committed burglary).

[12] *See* OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon . . . .").

[13] *See* OCGA § 16-5-40 (a) (" A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will."); OCGA § 16-5-40 (d) (4) ("A person convicted of the offense of kidnapping shall be punished by[ ] . . . [l]ife imprisonment or death if the person kidnapped received bodily injury.").

[14] *See* OCGA § 16-5-44.1 (b) (1) ("A person commits the offense of hijacking a motor vehicle in the first degree when such person while in possession of a firearm . . . obtains a motor vehicle from an individual or the presence of another individual by force and violence or intimidation or attempts or conspires to do so.").

a firearm during the commission of a felony,[15] financial-transaction-card fraud,[16] battery,[17] and possession of a firearm by a convicted felon during a crime.[18]

2. Next, Belcher contends that the trial court committed reversible error by permitting the State to elicit testimony that co-defendant Smith's father attempted to

---

[15] *See* OCGA § 16-11-106 (b) (1) ("Any person who shall have on or within arm's reach of his or her person a firearm . . . during the commission of, or the attempt to commit[ ] . . . [a]ny crime against or involving the person of another[ ] . . . and which crime is a felony, commits a felony and, upon conviction thereof, shall be punished by confinement for a period of five years, such sentence to run consecutively to any other sentence which the person has received.").

[16] *See* OCGA § 16-9-33 (a) (2) (B) ("A person commits the offense of financial transaction card fraud when, with intent to defraud the issuer; a person or organization providing money, goods, services, or anything else of value; or any other person; or cardholder, such person[ ] . . . [o]btains money . . . by[ ] . . . [p]resenting the financial transaction card without the authorization or permission of the cardholder or issuer[.]").

[17] *See* OCGA § 16-5-23.1 (a) ("A person commits the offense of battery when he or she intentionally causes . . . visible bodily harm to another.").

[18] *See* OCGA § 16-11-133 (b) (1) ("Any person who has previously been convicted of or who has previously entered a guilty plea to any felony involving the use or possession of a firearm and who shall have on or within arms reach of his or her person a firearm during the commission of, or the attempt to commit[ ] . . . [a]ny crime against or involving the person of another . . . and which crime is a felony, commits a felony and, upon conviction thereof, shall be punished by confinement for a period of 15 years, such sentence to run consecutively to any other sentence which the person has received."). The State presented evidence that Belcher had a previous felony conviction for possession of cocaine involving the possession of a firearm.

influence the victim by bribing him into changing his account of what took place. Although we agree that the trial court erred in admitting the evidence, we disagree that the error requires reversal of Belcher's convictions.[19]

The record reflects that after the victim was cross-examined and questioned at length about statements he made to law enforcement that were inconsistent with his trial testimony, the State sought to rehabilitate the victim by questioning him about Smith's father and the fact that he had been offered $5,000 by the father if he said that Smith was not involved in the robbery and that Belcher was the mastermind. And before hearing this testimony, the jury was instructed that it was being introduced for the limited purpose of the jury's consideration of the witness's credibility and believability.

In favor of admitting the testimony, the State argued that because cross-examination had suggested that the victim was "just making this up and essentially

---

[19] Because this case was tried after January 1, 2013, our new Evidence Code applies. *See* Ga. L. 2011, pp. 99, 214, § 101 (providing that Georgia's new Evidence Code applies "to any motion made or hearing or trial commenced on or after" January 1, 2013). As our Supreme Court has instructed, "[m]any provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when our courts consider the meaning of these provisions, they look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit." *Hayes v. State*, 298 Ga. 98, 102-03 (2) (b) (779 SE2d 609) (2015).

this is just some fight between him and [defendant] Partee and a completely made-up story, that opens the door to then bringing in why this is not a made-up story, essentially that he's turned down $5,000 to still come in here and tell the truth." The State also argued that

> [i]f it was the opposite, it would be easily admissible[.] If a victim in a crime files a lawsuit against somebody, it shows they have a financial motive against that defendant. And defense attorneys are always going to be able to ask a victim, you filed this lawsuit because you're trying to get money. Well, when the opposite a true [sic] where the victim has turned down money, I think that should come in just like the opposite[.] I think for that reason, the [S]tate should be able to ask [the victim] about [Smith's father] approaching him and offering him money to change his testimony[.]

The State continued that the victim's "credibility has been so attacked over and over and over again that essentially this is something that shows that he does not have some random motive against . . . any of these people other than just the truth." And again, the State argued that "[i]f someone has a . . . financial motive to lie, well, this is the inverse of that, is that he turned down a financial motive. So that goes back to his credibility in this case[.]"

There are many acceptable methods of attacking the credibility of a witness including, but not limited to, (1) attacking the general character for truthfulness of the witness; (2) showing that, before trial, the witness made statements that are inconsistent with his or her trial testimony; (3) showing bias of the witness; (4) showing that the witness's capacity to perceive, recall, or relate the relevant event is impaired; and (5) contradicting the substance of the testimony by the witness.[20] Some, but not all, of these methods of impeachment are explicitly included in the rules of

---

[20] *See United States v. Lindemann*, 85 F3d 1232, 1243 (II) (C) (7th Cir. 1996) (describing methods of impeachment); *Behler v. Hanlon*, 199 FRD 553, 556 (A) (D. Md. 2001) (same). *See generally* OCGA § 24-6-607 (providing that witness credibility may be attacked by any party); JOHN D. HADDEN, GREEN'S GEORGIA LAW OF EVIDENCE § 6:34 (2016-2017 ed.) (listing, as examples, different methods of impeachment).

evidence.[21] But our rules of evidence address the *rehabilitation*[22] aspect of only two of these methods—the witness's character for truthfulness[23] and prior statements made by the witness.[24] Accordingly, because "admissibility of evidence regarding a witness's [alleged] bias, diminished capacity, and contradictions in his testimony is not specifically addressed by the Rules, . . . [the] admissibility is limited only by the relevance standard of [OCGA § 24-4-402]."[25]

---

[21] *See* OCGA § 24-6-608 (a) (1)-(2) (concerning opinion and reputation evidence as to truthful/untruthful character); OCGA § 24-6-608 (b) (1)-(2) (concerning conduct indicative of the witness's bias as it is probative of truthfulness or untruthfulness); OCGA § 24-6-609 (concerning admission of certain criminal convictions for purposes of attacking character for truthfulness); OCGA § 24-6-613 (a), (b) (concerning prior inconsistent statements); OCGA § 24-6-622 (concerning witness bias); *see also Behler*, 199 FRD at 556-58 (A) (1)-(3) (noting that the following modes of impeachment are not directly covered by a specific rule of evidence: impeachment by showing of bias, interest in outcome, prejudice in a relevant way, or motive to give particular testimony; impeachment by contradiction; and impeachment by showing incapacity).

[22] *See generally* HADDEN, *supra* note 20, § 6:43 ("[T]he rules of rehabilitation after impeachment are more restrictive than those that apply to impeachment.").

[23] *See* OCGA § 24-6-608 (a).

[24] *See* OCGA § 24-6-613 (c).

[25] *Lindemann*, 85 F3d at 1243 (II) (C); *see also* OCGA § 24-4-402 ("All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible.").

14

On appeal, Belcher takes issue with the court's admission of the above-referenced testimony over his objection, contending that it was an abuse of discretion because (1) there was no evidence linking the father's efforts to influence the victim's testimony to any of the defendants,[26] (2) the evidence could not be used to rehabilitate the victim, and (3) the error was not harmless because a juror testified to being in fear for her life and was ultimately dismissed from service. We will address each of these contentions in turn.

(a) First, Belcher's arguments regarding the State's failure to link the testimony regarding Smith's father's attempt to influence the victim to any defendant is a nonstarter because the State did not introduce the testimony as circumstantial evidence of *guilt*.[27] Instead, the State argued that it was introducing the testimony to

---

[26] More specifically, Belcher argues that the testimony was inappropriate and inadmissible because "a familial relationship is insufficient proof of defendant [sic] participation."

[27] *Cf. Kell v. State*, 280 Ga. 669, 671 (2) (a) (631 SE2d 679) (2006) ("We recognize in Georgia that evidence of a defendant's attempt to influence or intimidate a witness can serve as circumstantial evidence of guilt. Even where the defendant does not personally make the attempt to influence or intimidate a witness, it is a settled principle of law that an attempt by a third person to influence a witness not to testify or to testify falsely is relevant and may be introduced into evidence in a criminal prosecution on the issue of the defendant's guilt where it is established that the attempt was made with the authorization of the accused." (citations and punctuation omitted)); *Johnson v. State*, 255 Ga. App. 721, 722 (2) (566 SE2d 440)

15

rehabilitate the victim's credibility, and the court admitted it for that purpose, giving the jury two limiting instructions to that effect. Accordingly, the authority Belcher relies upon is inapposite to what actually occurred in this case because he cites decisions concerning the use of such evidence as a means of establishing the guilt of the accused, not as evidence to rehabilitate a witness's credibility.[28]

Still, we must consider whether the State properly introduced the evidence as a means of rehabilitating the victim's credibility under Georgia's rules of evidence.

(b) In a somewhat convoluted and roundabout way, Belcher asserts that the trial court erred in admitting the evidence at issue to rehabilitate the victim's credibility because no rule of evidence would permit the admission of the type of evidence the State used. Specifically, he argues the defendants could not have "opened the door"

---

(2002) ("The State can show a defendant's attempt to influence a witness because it is evidence of consciousness of guilt. This includes attempts to influence witnesses made through intermediaries. But evidence of a threat or attempt to influence a witness made by a third party must be linked to the defendant in order to be relevant to any material issues." (citations and punctuation omitted)).

[28] *See supra* note 27; *see also Fields v. State*, 260 Ga. 331, 333 (4) (393 SE2d 252) (1990) (holding that it was reversible error to permit witness to testify as to threat he received by phone, for the stated purpose of showing that "a threat had been made against" the witness, when the State was unable to link the threat to the defendant, preventing the testimony from being relevant to any material issue). Suffice it to say, the State's use of the evidence cannot be saved under this same theory if the evidence was improperly admitted for purposes of rehabilitation.

to the inadmissible testimony and that the evidence was not admissible under OCGA § 24-6-608 because the victim's character for truthfulness had not been attacked, leaving the State with no reason to introduce the testimony.

The State, in an equally convoluted argument, does not specifically rely upon OCGA § 24-6-608. Instead, citing to cases that were decided under our *old* evidence code,[29] the State responds that the complained-of testimony was *generally relevant*

---

[29] The State cites *Robinson v. State*, 275 Ga. App. 537 (621 SE2d 770) (2005), for the proposition that "[a]lthough a party normally may not bolster the veracity of an unimpeached witness, the State may rehabilitate a witness whose credibility has been attacked." *Id*. at 538 (1) (punctuation omitted). The State then relies upon *Hall v. State*, 255 Ga. App. 631 (566 SE2d 374) (2002), for the proposition that "[e]vidence which goes to a witness's credibility is not relevant unless produced to attack the credibility of a witness, or to rehabilitate credibility when it has been attacked." *Id.* at 632 (1) (punctuation omitted). The trial court also relied upon *Hall* in denying Belcher's motion for new trial. We take this opportunity, once again, "to remind our highly capable trial courts and lawyers of the importance of relying upon the new Evidence Code, as well as its accompanying case law, in addressing evidentiary issues arising after the new code's effective date." *Patch v. State*, 337 Ga. App. 233, 241 (2) n.21 (786 SE2d 882) (2016); *see Stratacos v. State*, 293 Ga. 401, 408 (2) (b) n.10 (748 SE2d 828) (2013) ("[I]t is always risky for courts to rely on a precedent interpreting a statute or other legal text without first examining whether the legal text on which the precedent was based has been revised and then considering the effect of any such change . . . . And we add that courts relying on old precedents regarding evidentiary issues should be particularly attuned to this risk in light of Georgia's new Evidence Code.").

17

to the victim's credibility under OCGA § 24-4-401,[30] and that the cross-examination of the victim was "brutal." But the State does not contend—and the record does not reflect—that cross-examination of the victim included any manner of impeachment that would permit introduction of the complained-of evidence as being generally relevant.[31] Thus, the general rule of relevance upon which the State specifically relies

---

[30] *See* OCGA § 24-4-401 ("As used in this chapter, the term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

[31] There was no showing that the victim was biased in some way. *See United States v. Henderson*, 337 F3d 914, 918 (A) (7th Cir. 2003) ("[T]he admissibility of rehabilitation evidence following an attack on the witness's bias is controlled solely by considerations of relevance."); *Lindemann*, 85 F3d at 1243 (II) (C) ("[A]dmission of evidence regarding [the witness's] cooperation in other cases was relevant. The evidence specifically rebutted the allegation that [the witness] was biased out of self-interest in [the defendant's] case: [the witness's] successful participation in numerous other cases meant that at the time he was negotiating over his plea deal, he had lots of information to use as bargaining chips. That fact was relevant under the standards of Fed. R. Evid. 402 because it made less probable the assertion that [the witness] was lying in [the defendant's] case out of self-interest."). Additionally, even to the extent that the victim may have been impeached by showing that he had "an impaired capacity to perceive, recall, or relate the event about which he [was] testifying" or by "contradicting the substance of the witness's testimony," *Lindemann*, 85 F3d at 1243 (II) (C), the complained-of evidence about an attempted bribery by a co-defendant's father was not relevant to rebut any such challenge. *See generally* RONALD L. CARLSON ET AL., EVIDENCE: TEACHING MATERIALS FOR AN AGE OF SCIENCE AND STATUTES 425 (7th ed. 2012) ("[T]he courts' rule of thumb on rehabilitation is response in kind. To minimize the danger of distracting the jury, the courts require the rehabilitation to be a response in kind to the impeachment.").

18

is an insufficient basis to support admission of the testimony for purposes of rehabilitation. And, as Belcher notes, there is no rule that generally "opens the door" to otherwise inadmissible evidence.[32]

Notwithstanding specifically relying upon relevancy to support admission of the complained-of evidence to rehabilitate the victim, the State then argues that defense counsel not only pointed to inconsistencies between the victim's testimony and his prior statements to law enforcement but also "alleged recent fabrication of testimony and improper influence."[33] But the State does not discuss the rules of

[32] *See Smith v. State*, 299 Ga. 424, 430 (2) (c) n.5 (788 SE2d 433) (2016) ("We note that 'opening the door' is not a freestanding evidence rule allowing a party to present to the jury otherwise inadmissible evidence; the phrase appears nowhere in the new Evidence Code or in the Federal Rules of Evidence on which our new code was largely based. Instead, 'opening the door' is a metaphor used for a variety of situations that arise in criminal and civil trials involving conduct by one party that allows the other party to introduce evidence that otherwise would not be allowed.").

[33] The State does not provide a record citation or quote any language from the transcript to specifically support this assertion, leaving us to guess what portions of the transcript the State believes qualify as this type of impeachment. *See* COURT OF APPEALS RULE 25 (b) (1) ("Part One shall point out any material inaccuracy or incompleteness of appellant's statement of facts and any additional statement of facts deemed necessary, plus citations to additional parts of the record or transcript deemed material. Failure to do so shall constitute consent to a decision based on the appellant's statement of facts. Except as controverted, appellant's statement of facts may be accepted by this Court as true."); COURT OF APPEALS RULE 25 (b) (2) ("Part Two shall contain appellee's argument and the citation of authorities as to each enumeration of error. It shall also include the standard of review if different from that

19

evidence that address the types of rehabilitation evidence that may be introduced in the wake of such impeachment.[34]

Likewise, the trial court's order denying Belcher's motion for new trial does not specify which provision(s) of the new Evidence Code supported admission of the complained-of testimony, only concluding that the evidence was admissible as rehabilitative evidence "even though there was no direct evidence linking the defendant with this effort by the father of a co-defendant." In support, the trial court cites to *Coleman v. State*[35] and *Lindsay v. State*.[36] But these cases were not only decided under our old Evidence Code,[37] they are also factually inapposite.

*Coleman* concerned testimony "about an anonymous threat [the victim] received on his answering machine the morning he was scheduled to testify,"[38] and

---

contended by the appellant.").

[34] *See supra* notes 23 & 24; *infra* Divisions (2) (b) (i) & (ii).

[35] 278 Ga. 486 (604 SE2d 151) (2004). The State also cites to *Coleman* on appeal to support its assertion that the complained-of testimony was appropriately admitted.

[36] 295 Ga. 343 (760 SE2d 170) (2014).

[37] *See supra* notes 19 & 29.

[38] *Coleman*, 278 Ga. at 487 (3).

the Supreme Court held that the testimony was appropriately admitted "to *explain* the witness's evasive and extremely reluctant conduct on the witness stand"[39] and "to *explain* why the witness was being difficult, which was a relevant area of inquiry at trial."[40] This was not the purpose of the complained-of testimony here.

In *Lindsay*, a witness testified to receiving threatening phone calls that attempted to dissuade her from testifying.[41] The Supreme Court in *Lindsay* relied upon *Kell*, discussed in Division 2 (a) *supra*, to hold that

> [e]vidence of a defendant's attempt to influence or intimidate a witness is circumstantial evidence of guilt, even in the situation in which the defendant does not personally make the attempt, that is, action by a third party to influence a witness not to testify or to testify falsely is relevant and admissible into evidence in a criminal prosecution on the issue of the defendant's guilt when the accused is shown to have authorized the attempt.[42]

And the Supreme Court *further* noted that "there was no objection at trial to admission of evidence of the calls on the basis that they had not been sufficiently

---

[39] *Id.* at 488 (3) (punctuation omitted).

[40] *Id.* (punctuation omitted).

[41] 295 Ga. at 348 (3).

[42] *Id.*

connected to [the defendant], nor is any error in that regard enumerated in this appeal."[43] Again, this situation is clearly distinguishable from the facts and arguments presented in this case.

Thus, none of the cases the trial court relied upon to deny Belcher's motion for new trial on this ground support the court's conclusion that admission of the complained-of testimony was appropriate. And because we have rejected the State's assertion that the evidence was *generally* relevant, we must now assess the potentially applicable rules of evidence to determine under which rule, if any, the State could have properly introduced the complained-of testimony.[44]

(i) *OCGA § 24-6-608.* As we have recently explained, OCGA § 24-6-608 ("Rule 608") of our new Evidence Code "provides very specific, limited methods for attacking or supporting the credibility of a witness by evidence in the form of opinion or reputation."[45] In this case, we are concerned with the manner in which Rule 608

---

[43] *Id.*

[44] *See West v. West*, 199 Ga. 378, 387 (4) (34 SE2d 545) (1945) ("If evidence is admissible for any purpose, its admission will not cause a new trial." ( punctuation omitted)); *Central Ga. Women's Health Ctr., LLC v. Dean*, 342 Ga. App. 127, 139 (2) (800 SE2d 594) (2017) (same).

[45] *Douglas v. State*, 340 Ga. App. 168, 171 (2) (796 SE2d 893) (2017) (punctuation omitted); *accord Gaskin v. State*, 334 Ga. App. 758, 761 (1) (a) (780

permits *supporting* a witness's credibility in order to rehabilitate a witness after impeachment under this rule.[46]

Under Rule 608 (a), witness credibility may be *supported* by opinion or reputation evidence subject to two limitations: (1) the evidence may only refer to character for truthfulness, and (2) evidence of truthful character is only admissible "after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."[47] Assuming without deciding that the so-called "brutal" cross-examination to which the victim was subjected opened the door to rehabilitation under Rule 608 (a),[48] the testimony at issue was not the type of

---

SE2d 426) (2015); *Williams v. State*, 332 Ga. App. 546, 548 (1) (b) (774 SE2d 126) (2015).

[46] *See* OCGA § 24-6-608 (a) (1) (providing for a method of impeachment, in that witness credibility may be *attacked* by opinion or reputation evidence, subject to the limitation that the evidence may refer only to character for untruthfulness).

[47] OCGA § 24-6-608 (a) (1)-(2); *accord Douglas*, 340 Ga. App. at 171-72 (2); *Gaskin*, 334 Ga. App. at 761-62 (1) (a); *Williams*, 332 Ga. App. at 548 (1) (b). *See generally* Ronald L. Carlson and Michael Scott Carlson, CARLSON ON EVIDENCE, p. 294 (6th Ed. 2018) ("Under Rule 608 (a), . . . evidence of truthful character is admissible, but only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.").

[48] *Compare United States v. Murray*, 103 F3d 310, 320-21 (III) (3rd Cir. 1997) (holding that witness's character for truthfulness was "otherwise attacked" within meaning of Rule 608 (a) when, although defendant presented no opinion or reputation

rehabilitative evidence allowed by the rule (*i.e.*, testimony by a different witness regarding opinion or reputation of the victim's truthfulness), precluding admission via Rule 608 (a).[49]

---

evidence to impeach witness, counsel performed vigorous cross-examination of witness, exposing various illegal and sordid activities), *with United States v. Danehy*, 680 F2d 1311, 1314 (I) (11th Cir. 1982) (holding that mere fact that witness is contradicted by other evidence in case during vigorous cross-examination does not constitute an attack upon reputation for truth and veracity so as to allow witness to introduce evidence of his reputation for truthfulness), *and United States v. Lay*, No. 1:07 CR 339, 2007 WL 2902912, at *5 (V) n.13 (N.D. Ohio 2007) ("The circuit court found no error in the trial court's exclusion of the proffered testimony [regarding truthful character,] concluding that an effort by the government's counsel pointing out inconsistencies in testimony and arguing that the accused testimony is not credible does not constitute an attack on the accused's reputation for truthfulness within the meaning of Fed.R.Evid. 608."). *See generally* Carlson, *supra* note 47, p. 294 ("Vigorous cross examination and/or the fact that a witness is contradicted by other evidence in the case does not constitute an attack governed by Rule 608 (a)."); *id.* p. 283-84 ("[B]olstering before impeachment of the witness is objectionable. Not every cross-examination opens the door to rehabilitation via responsive bolstering. . . . The fact that a witness takes the stand to testify does not automatically create the right to offer evidence to bolster his credibility. While a 'slashing cross-examination' may be sufficient to qualify as an attack on credibility under Rule 608, only when the tenor of cross-examination can be characterized as an attack on the witness' veracity can evidence of his truthful character be offered to rehabilitate the witness." (footnotes omitted));

[49] *See United States v. Marshall*, 173 F3d 1312, 1315-16 (II) (A) (11th Cir. 1999) ("If the prosecutor was seeking to elicit evidence regarding [another witness's] veracity, the question should have been phrased very differently—for example, "What is your opinion as to [the earlier witness's] character for truthfulness?" The question as asked cannot be considered proper under Rule 608 (a) (2). Thus, the district court erred in admitting [the later witness's] answer."); *United States v. Greer*, 643 F2d

24

As for Rule 608 (b), it provides that, with certain exceptions, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, . . . may not be proved by extrinsic evidence."[50] But such instances may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness[ ] . . .

---

280, 283 (5th Cir. 1981) ("[Because] counsel's question inquired of [the earlier witness's] reputation in the community, rather than being limited to his reputation for truthfulness and veracity, it was improper under Rule 608 (a)."); *see also United States v. Solomonson*, 908 F2d 358, 362 (II) (A) (2) (8th Cir. 1990) ("[T]o rehabilitate a witness whose credibility has been attacked, any competent witness can testify, in the form of opinion or reputation, as to a witness's truthful character."); *United States v. Watson*, 669 F2d 1374, 1382 (11th Cir. 1982) ("The reputation witness must have sufficient acquaintance with the principal witness and his community in order to ensure that the testimony adequately reflects the community's assessment. In contrast, opinion testimony is a personal assessment of character. The opinion witness is not relating community feelings, the testimony is solely the impeachment witness' own impression of an individual's character for truthfulness." (citation omitted)). *See generally* Carlson, *supra* note 47, p. 295 ("To rehabilitate a witness whose credibility has been attacked, any competent witness can testify, in the form of opinion or reputation, as to a witness's truthful character.").

[50] OCGA § 24-6-608 (b); *accord Douglas*, 340 Ga. App. at 172 (2); *Gaskin*, 334 Ga. App. at 762 (1) (a);*Williams*, 332 Ga. App. at 548-49 (1) (b); *see also Dean*, 342 Ga. App. at 141 (2) n.9 ("Rule 608 (b) provides that if the witness denies the specific bad act on cross-examination that bears on the witness' character for untruthfulness, the act 'may not be proved by extrinsic evidence and the questioning party must take the witness' answer, unless the evidence would be otherwise admissible as bearing on a material issue of the case.'").

25

[c]oncerning the witness's character for truthfulness or untruthfulness[.]"[51] Here, of course, Rule 608 (b) does not support admission of the testimony at issue because it was elicited on *redirect*, not cross-examination, and the evidence was presented in order to *rehabilitate* the witness, not impeach.[52]

---

[51] OCGA § 24-6-608 (b) (1)-(2); *accord Douglas*, 340 Ga. App. at 172 (2); *Gaskin*, 334 Ga. App. at 762 (1) (a);*Williams*, 332 Ga. App. at 549 (1) (b); *see also Dean*, 342 Ga. App. at 139-40 (2) ("Under Rule 608 (b) (1) of Georgia's revised Evidence Code, a trial court may allow questioning about specific instances of conduct by a witness on cross-examination, if the conduct is probative of the witness's character for truthfulness or untruthfulness." (footnote omitted)). *See generally* Carlson, *supra* note 47, p. 299 ("Rule 608 (b) applies to the cross-examination of criminal defendants as well as other witnesses.").

[52] *See Gaillard v. Jim's Water Serv., Inc.*, 535 F3d 771, 778 (III) (B) (8th Cir. 2008) (noting that Rule 608 (b) of the Federal Rules of Evidence "allows the court in its discretion to allow cross examination of witnesses regarding specific instances of a witness's own conduct if the past experiences are probative of a character of untruthfulness" (punctuation omitted)); *United States v. McNatt*, 931 F2d 251, 255 (IV) (4th Cir. 1991) ("Federal Rule of Evidence 608 (b) on cross-examination of a witness allows inquiry into specific instances of conduct of the person about whose character the witness is testifying, but the rule does not allow the party calling the witness to inquire into specific instances of conduct nor introduce extrinsic evidence of such." (footnote omitted)). *See generally* HADDEN, *supra* note 20, § 6:37 ("The advocate may, at the discretion of the court, use specific instances of conduct during cross-examination of a witness who has given opinion or reputation evidence on either truthfulness or untruthfulness. The court's discretion in allowing or disallowing inquiry into specific instances will not be reversed absent clear abuse of discretion. Where the witness provides opinion or reputation testimony, the opposing party may test that testimony with specific instances of conduct if the instances are 'probative of truthfulness or untruthfulness.' The opponent, where appropriate, may inquire into conduct either of the witness or of another witness about whose truthfulness the

26

(ii) *OCGA § 24-6-613.* In denying Belcher's motion for new trial on this ground, in addition to the cases discussed *supra*, the trial court relied upon *Thompson v. State*[53] for the proposition that "[a] witness's veracity is placed in issue . . . if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination."[54] But pertinent language is missing from the trial court's quote. Indeed, importantly, the complete proposition from the case reads as follows: "A witness's veracity is placed in issue *so as to permit the introduction of a prior consistent statement* only if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination."[55]

Moreover, even assuming that the victim was cross-examined with charges of recent fabrication or improper influence as the State alleges,[56] OCGA § 24-6-613

witness had testified." (footnotes omitted)).

[53] 281 Ga. App. 627 (636 SE2d 779) (2006). We note that *Thompson* was also decided under our old Evidence Code.

[54] *Thompson*, 281 Ga. App. at 631 (3) (punctuation omitted).

[55] *Id.* (punctuation omitted) (emphasis supplied).

[56] *See United States v. Drury*, 396 F3d 1303, 1316 (II) (D) (11th Cir. 2005) ("[P]rior consistent statements are treated as admissible non-hearsay *only if* they are offered to rebut a specific allegation of recent fabrication, not to rehabilitate credibility that has been *generally* called into question." (second emphasis supplied))

("Rule 613") provides that when this occurs, the witness may be rehabilitated through the introduction of a prior consistent statement that was "made before the alleged recent fabrication or improper influence or motive arose."[57] And here, the victim was not rehabilitated with a prior consistent statement. Nor was the testimony regarding the attempted bribery used to in any way *explain* the prior inconsistent statements to law enforcement about which the victim was cross examined.[58] Instead, the State

[57] OCGA § 24-6-613 (c); *see Dimauro v. State*, 341 Ga. App. 710, 725 (5) (801 SE2d 558) (2017) ("It is well established that a witness's prior consistent statement is admissible only [when]: (1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination. And a witness's veracity is placed in issue, so as to permit the introduction of a prior consistent statement, if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination." (punctuation and footnote omitted)). *Cf. Johnson v. State*, 328 Ga. App. 702, 706 (2) (760 SE2d 682) (2014) ("The State did not elicit testimony from the trooper about [the victim's] statements to rehabilitate her after the defense attacked her veracity; instead, the State elicited the testimony during its direct examination of the witness simply to bolster the victim's credibility. Thus, the trial court erred by admitting the trooper's testimony regarding [the victim's] prior consistent statements.").

[58] *Cf. Bivins v. State*, 200 Ga. 729, 741 (8) (38 SE2d 273) (1946) ("The witness, having admitted that he had committed perjury at the coroner's inquest, was entitled to explain as best he could his reasons for doing so, and the jury could take these facts into consideration in passing on the credibility of the witness."); *Nealy v. State*, 239 Ga. App. 651, 655-56 (8) (522 SE2d 34) (1999) ("Earlier in the trial, [the victim] gave testimony that the defendants were not the robbers that was inconsistent with other trial testimony and pretrial statements he made identifying the defendants as the robbers. In subsequent testimony, [the victim] said that, earlier in the trial, he had

28

presented testimony regarding the father of one of the co-defendants attempting to influence the victim's testimony by offering a bribe that the victim rejected. Thus, the State could not have introduced the evidence through Rule 613.

(iii) Given the particular circumstances discussed *supra*, the complained-of testimony was neither admissible as generally relevant nor under the rehabilitation strictures of Rules 608 and 613. Accordingly, the trial court erred by permitting the State to introduce testimony concerning the attempt to bribe the victim for purposes of rehabilitating the victim's credibility.[59] We must now consider whether the admission of the testimony was harmless.

---

falsely testified that the defendants were not the robbers because an unidentified person threatened him with bodily harm if he testified against the defendants and because [a defendant's] father had bribed him with money. The trial court properly allowed [the victim] to give this testimony to explain why he had testified falsely and to rebut its discrediting effect. Moreover, before [the victim] gave his explanation, the trial court gave cautionary instructions to the jury that the testimony was solely for the purpose of explaining [the victim's] changed testimony, and that it was not to be considered as evidence against any of the defendants or for any other purpose." (citations omitted)).

[59] *Cf. Dean*, 342 Ga. App. at 139-41 (2) (holding that trial court did not abuse its discretion in admitting evidence of a specific instance of conduct pursuant to Rule 608 (b) when the act was probative of untruthfulness); *United States v. Abair*, 746 F3d 260, 264 (II) (A) (7th Cir. 2014) (holding that trial court abused its discretion by permitting cross-examination as to specific instance of conduct when State failed to establish sufficient basis that instance was probative of witness's character for untruthfulness).

(c) Belcher asserts that the admission of the above-referenced testimony concerning Smith's father, without establishing any link to a defendant, was not harmless because a juror was dismissed out of fear for her life. But as to the dismissed juror, the record in no way reflects that she was in fear for her life and ultimately dismissed *because* of the complained-of testimony. Instead, the record shows that the juror had previously lived in the same community as the three defendants; still maintained connections to a local fast-food restaurant where she had worked for 13 years; and grew concerned that the defendants would seek retribution against her if they learned her identity through any shared connections within that community. The juror never in any way linked her safety concerns to the aforementioned testimony regarding Smith's father, instead only specifically mentioning that the evidence and the testimony in the case had involved the use of firearms. Thus, the dismissal of this juror is not, as Belcher asserts, direct evidence of harm flowing from the victim's testimony regarding the attempted influence by Smith's father.

Nevertheless, although Belcher does not discuss the exact harmless-error standard applicable to this case, he does assert that the evidence against him was not overwhelming. And our Supreme Court has recognized that the new Evidence Code "continues Georgia's existing harmless error doctrine for erroneous evidentiary

30

rulings."[60] Thus, in determining if an error was harmless, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so."[61] Finally, the test for determining "nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict."[62]

Considering the record as a whole, we conclude that it is highly probable that the error did *not* contribute to the jury's verdict. Indeed, as detailed *supra*, in addition to the victim's testimony, the State presented evidence that a witness overheard Belcher say that he wanted to rob someone with a gun that night; party guests looked at Partee's phone when it was left unattended and saw text messages that referenced a plan to commit a robbery; Belcher was seen with Partee at the party by multiple witnesses; the ATM machine photographed who made the withdrawals, which the

---

[60] *Smith*, 299 Ga. at 431 (2) (d); *see* OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .").

[61] *Smith*, 299 Ga. at 432 (2) (d) (punctuation omitted); *accord Rivera v. State*, 295 Ga. 380, 382 (2) (761 SE2d 30) (2014).

[62] *Smith*, 299 Ga. at 432 (2) (d) (punctuation omitted); *accord Rivera*, 295 Ga. at 382 (2).

victim testified was Partee; Belcher bore a scar on his abdomen, corroborating the

victim's story; and Belcher lied about his alibi.[63]

Accordingly, for all these reasons, we affirm Belcher's convictions.

*Judgment affirmed. Ray and Self, JJ., concur.*

---

[63] *See Paschal v. State*, 335 Ga. App. 411, 414 (1) (780 SE2d 681) (2015) (holding that it was highly probable that inadmissible evidence did not contribute to the jury's verdict in light of other overwhelming evidence of guilt); *Williams v. State*, 312 Ga. App. 693, 695 (2) (719 SE2d 501) (2011) (same); *Massey v. State*, 306 Ga. App. 180, 184 (3) (a) (702 SE2d 34) (2010) (same).